## KATH. SHADLER ET AL. v. BLAIR COUNTY.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS OF BLAIR COUNTY.

Argued April 25, 1890—Decided October 6, 1890.
[To be reported.]

(a) The act of April 13, 1843, P. L. 221, imposes upon the commissioners of the counties of the commonwealth the duty of keeping county bridges in repair. That act, as to Huntingdon county, was repealed by the act of March 11, 1844, P. L. 86. By the act of February 26, 1846, P. L. 64, Blair county was erected out of parts of Huntingdon and Bedford counties:

1. By the act creating Blair county, providing that the officers of said county should be subject to "the same duties . . . . . as other similar officers" in the other counties of the state, it became the duty of the county commissioners, under the general law, to keep in repair county bridges erected prior to 1846, in territory taken from Huntingdon county.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

No. 360 January Term 1890, Sup. Ct.; court below, No. 136 January Term 1888, C. P.

On December 12, 1887, Katharine Shadler and David Shadler, by his guardian, D. Moyer, brought trespass against the county of Blair, to recover damages for the death of Henry Shadler, husband of said Katharine and father of said David Shadler, alleged to have been caused by the negligence of the defendant. The defendant's plea was not guilty.

At the trial on January 27, 1890, the following facts were shown:

Henry Shadler was the owner of a steam threshing machine,

and carried on the business of threshing grain for farmers residing in the vicinity of Williamsburg, Blair county. The thresher was moved as well as operated by a traction engine. On November 16, 1887, Shadler started to take the traction engine, without the separator, over the Juniata river by way of a bridge at Williamsburg. When the engine, after going upon the bridge, had proceeded about twenty feet, the structure gave way and the engine and boiler were thrown into the river; Shadler was killed, and his assistant, John Kipe, was injured.

The bridge in question, partly in Woodbury township and partly in Catharine township, the river being the dividing line between the two, was about 180 feet in length. It was originally built by the county of Huntingdon in 1838 and 1839, the townships named being a part of that county at that date, and was of record as a county bridge. By the act of March 11, 1844, P. L. 86, Huntingdon county was excepted out of the operation of the act of April 13, 1843, imposing upon counties the duties of keeping county bridges in repair. Blair county was formed out of parts of Huntingdon and Bedford counties by the act of February 26, 1846, P. L. 64, the townships of Woodbury and Catharine being embraced in that part of Huntingdon county which was thus incorporated into Blair county. In 1871, and again in 1881, Blair county repaired this bridge. There was no evidence that the townships ever made any repairs upon it.

Testimony for the plaintiffs tended to prove that the bridge was in a bad state of repair, the sills and other important timbers, which had never been replaced since its original construction, being very much decayed from dry rot; that an ordinary inspection would have disclosed that defect, although to outward appearance the timbers remained sound; that ordinary care, in the case of an old bridge like this one, would require an inspection once in every three to five years, and that there was no inspection of it made after 1881, and no sufficient or proper inspection was then made. There was testimony on both sides, upon the question whether the use that Shadler was making of the bridge imposed upon it an extraordinary and unusual strain.

At the close of the testimony, the court, DEAN, P. J., charged

the jury, submitting to them the questions whether the county commissioners had exercised ordinary care to ascertain the condition of the bridge and make such repairs as would render it reasonably safe for the use of the traveling public; whether the use to which Shadler put it imposed upon the bridge an extraordinary or unusual weight, producing an extraordinary or unusual strain upon the timbers; whether it would have been safe to ordinary travel, and whether or not Shadler was guilty of contributory negligence; and refused a point asking for binding instructions in favor of the defendant, reserving for subsequent consideration, with the right to enter judgment, non obstante veredicto, should there be a verdict for the plaintiffs, the following point submitted by the defendant:

7. The bridge, on which the alleged accident took place, being in a part of Huntingdon county which was separated therefrom in 1846 to form the county of Blair, and the act of April 13, 1843, imposing on counties the liability to repair county bridges, having been repealed as to Huntingdon county by the act of March 11, 1844, there can be no recovery in this case, and the verdict must be for the defendant.

The verdict of the jury was in favor of the plaintiffs for $2,000. After argument, the court, DEAN, P. J., made absolute a rule for judgment for the defendant, non obstante veredicto, filing an opinion which, after reciting the facts and the point reserved, proceeded as follows:

As a general rule, bridges are to be maintained by the same parties as maintain the roads and highways. This was the law in this state up until the passage of the act of April 13, 1843, which is as follows: "It shall be the duty of the county commissioners of the several counties of the commonwealth, to repair all bridges erected by the county, and to pay the expenses of such repairs out of the county treasury in the usual manner." Five counties were excepted from the operation of this act, in the original bill. On March 11, 1844, Huntingdon county was excepted. This simply relegated the county to its common-law liability. The defendant alleges, that the exception has the effect of a local act, covering the territory of Huntingdon county, which remains in force as to all parts of that territory until expressly repealed.

Opinion of Court below.

The first case bearing on the question is Camack's Road Case, 1 Bro. 164, which was this: The general act of April 6, 1802, authorized the laying out of all roads in the state, by six viewers appointed by the Court of Quarter Sessions. By act of April 3, 1804, it was enacted that in the township of Northern Liberties and district of Southwark twelve viewers should be appointed to lay out roads in this territory, neither of whom should be owners of real estate in the district. In 1807, under the general law of 1803, authorizing the formation of new townships, the township of Penn was created, embracing within its boundaries the territory of Northern Liberties. In 1810, a petition was presented to the court, under the special law, for a continuation of a road called Camack's road in Penn township, and the court appointed twelve viewers, as provided in the special act of 1804, who reported in favor of the road. A motion was then made to quash the whole proceeding, on the ground that the creation of the new township of Penn subjected all the territory, embraced within its limits, to the provisions of the general road law of the state, and made the special law of the Northern Liberties inoperative as to that portion of its territory included in Penn. The court ruled that the formation of the new township, under the general law, left the local law undisturbed, and refused the motion to quash. The reason given for the decision is, that, the local law being a legislative enactment, a general law passed afterwards, authorizing the courts to erect new townships, neither repealed nor gave the courts power to abrogate local laws in force on territory out of which new townships were formed; the legislature alone, by express enactment had the power.

This was a judgment of the Common Pleas of the first district, as the courts were at that time organized, but the decision is afterwards cited with approval by the Supreme Court in Clifford v. Belstering, 2 S. & R. 107, a case decided in 1815. The court, in deciding substantially the same question, say: " This was decided in the Court of Common Pleas, in the case of Camack's Road, where the principle was fully discussed and the opinion of the court delivered at large with very satisfactory reasons."

In Parsons v. Winslow, 1 Gr. 160, the county of Elk was formed out of parts of Jefferson, Clearfield and McKean, in

each of which a special mechanics' lien law was in force at the time of the division, but the law had not been extended specifically to Elk, when the lien in dispute was filed. It was argued that the law extended only over the territorial limits of the counties named in it; that when territory was taken from them and made into a new county, the law applicable to the other counties was not operative in a new county by another name. The Supreme Court say: " Territory or men, once made the objects of legislation, remain subject to the laws imposed, however names by which they are designated may be changed."

In Lackawanna Co. v. Stevens, 105 Pa. 465, Lackawanna county had been formed out of part of Luzerne in August, 1878, and a special act fixing fees of sheriffs in Luzerne county had been passed in 1873. The question was, whether the division of the territory in 1878 had the effect of repealing the special act of 1873 as to Lackawanna county. The Supreme Court say: "Did the subsequent formation of the county of Lackawanna, out of a portion of the territory, operate as a repeal thereof (the special act) in the new county? We think not. The act providing for the formation of the county did not repeal any of the special laws then in force. Although the name of the municipality which covered this portion of the territory was changed, yet the effect thereof was not by implication to repeal any local laws then in force within its boundaries."

The principle of these and all the cases I have examined is, that the repeal of a special law will not be implied, simply because a portion of the territory of an old county or township has been cut off and made into a new one; to repeal, there must be an express enactment.

I admit, the law, in the cases cited, is based on a state of facts differing somewhat from those in the case before me. In all the cases mentioned, the old municipality had been made subject to the provisions of an affirmative, special statute, irrepealable by implication and not repealed by expression. Here, the county of Huntingdon, after being subject one year to a general law, is excepted from its provisions. It is not the case, exactly, of a locality subject to a special law, but of one excepted from the operation of a general law. This left it to its common-law liability; unless that, under the circumstances, be

treated as equivalent to a special statutory liability, there was no special law to repeal.

In this view, it is argued, that express repealing words were not necessary to subject the new county to the general laws of the state, for that subjection necessarily followed from the very act of creation; that by that act the county became subject to the general bridge law, just as it became subject to the general judicial, tax, and road laws of the commonwealth; that the enacting clause of the act of 1846, after naming the townships to be severed from Huntingdon and Bedford, says: " They are hereby erected into a new and separate county to be called Blair, and the inhabitants thereof shall from the fourth Monday of July next, have all such courts, jurisdictions and privileges as the inhabitants of the other counties of the commonwealth are or may be entitled to; " that, there being no affirmative special statute in force in Huntingdon to be repealed, under the words of this enactment the general bridge law at once fastened its provisions on the new county and it became subject to it; that, taking the territory from the county excepted, took it out of the exception and put it under the operation of the general rule.

While I have considered this view of the question, it is not of sufficient weight to warrant me in saying that the principle laid down in the authorities cited, is not applicable to the facts in this case. Reasons for denying the point, drawn from the confusion which must follow from the existence of a different liability in different sections of the county, and the tendency of the courts of later years to promote harmony, by construing laws as having a general operation rather than a local one, must be addressed to the court having the power to change the decisions which declare the law in this case.

Nor do I think the fact, that the county occasionally repaired this bridge estops it from denying now that it was its duty to repair; such acts cannot create a statutory liability, if none existed. Nor do I think that the peculiar phraseology of the act of 1846, establishing Blair county, wherein the rights and privileges of the inhabitants thereof, and the duties of county officers are specified as being the same as those of the other counties of the commonwealth, is sufficient to warrant us in saying that the exception is not in force in the new county. As the law stands, in my opinion it is with the defendant.

Let judgment be entered for defendant notwithstanding the verdict for plaintiffs.

—Thereupon, the plaintiffs took this appeal specifying that the court erred:

5. In entering judgment for the defendant, on the reserved question, non obstante veredicto.

*Mr. H. M. Baldridge,* for the appellants :

1. The cases cited by the court below in support of its opinion, do not rule that under all circumstances new counties are to be governed by the local laws of the counties from which they were taken, rather than by the general laws of the commonwealth. Those cases were decided in view of the special circumstances surrounding them, and were not intended to enunciate a general principle, regardless of all circumstances. Even if they sustain the proposition in support of which they are cited, they do not control this case, as there was no special law applicable to Huntingdon county when Blair was taken from it. The act of April 13, 1843, P. L. 221, had simply been repealed as to Huntingdon. When Blair was erected, did not that act apply to it? If not, it must be governed by some other law, statutory or common.

2. In Pennsylvania the duty to repair bridges is statutory : Rapho v. Moore, 68 Pa. 406. Prior to the act of 1843, the duty of building and maintaining bridges was regulated by the act of June 13, 1836, P. L. 555. Its 35th section directs when bridges shall be built at the county expense, but it is silent as to their repair. By implication, the obligation to build carries with it the duty to repair : Phoenixville v. Iron Co., 45 Pa. 140. See also Meadville v. Canal Co., 18 Pa. 68. But, as there was no special law in Huntingdon when Blair was formed, the act of 1846, erecting the latter county, which imposes on its officers the same duties as those of similar officers in other counties, brings the county under the general act of 1843. Blair county has always recognized its obligation to maintain this bridge. All repairs to it have been made by the county, and the townships have never repaired it. The county's long-continued recognition of this obligation is sufficient to determine its liability : Meadville v. Canal Co., supra.

*Mr. W. I. Woodcock* and *Mr. Martin Bell, Jr.*, for the appellee:

1. Prior to the act of April 13, 1843, P. L. 221, the duty of maintaining bridges rested on the townships · Erie Co. v. Commonwealth, 127 Pa. 207. The act of March 11, 1844, P. L. 86, which repealed the act of 1843 as to Huntingdon county, was special or local in its nature, and therefore territorial in its application. Accordingly, when the territory on which the bridge stood was taken from Huntingdon county in 1846, it came into the new county of Blair stamped with said local law which imposed the burden of repairing county bridges on the townships. On this question we refer to the authorities cited by the court below, and to the latest case we can find on the subject, South Abington Tp. Road, 109 Pa. 120.

2. The attempt to distinguish the act of 1844 from an ordinary local law, is without force. By it Huntingdon county was made subject to a rule of its own, not governing the state at large; and it is immaterial whether this result was effected by an enactment in positive terms or by the partial repeal of a general law. The act of February 26, 1846, erecting the county of Blair, contains no positive words repealing local acts governing any part of the territory, and without positive words no such repeal is to be implied: Sifred v. Commonwealth, 104 Pa. 181; Morrison v. Fayette Co., 127 Pa. 110; Brown v. Commissioners, 21 Pa. 43; Malloy v. Commonwealth, 115 Pa. 25.

3. The fact that the county commissioners in 1871 and 1881 repaired this bridge is immaterial, whether such repairs were made in ignorance of the law or as a gratuity. Blair county could not be estopped thereby. The doctrine of estoppel does not apply in such a case to a public corporation: Platter v. Commissioners, 103 Ind. 360; nor are the elements of estoppel present in this case: Bigelow on Estoppel, 480. The local law could not be repealed by non-user: Homer v. Commonwealth, 106 Pa. 221. The authority of county commissioners is limited and statutory: Lancaster Co. v. Fulton, 128 Pa. 48; and their duty as to repair of bridges is statutory: Rapho v. Moore, 68 Pa. 406. Without authority from a statute, they cannot bind the county by recognizing or assuming an obligation.

OPINION, MR. JUSTICE STERRETT:

This action was brought by the widow and minor child of Henry Shadler to recover damages for the death of the latter, caused, as the jury found, by the negligence of the county.

It appears that the deceased, Mr. Shadler, was engaged in threshing for farmers in the vicinity of Williamsburg.  At that place, the Juniata river, dividing the townships of Woodbury and Catharine, in said county, was spanned by a bridge about 180 feet long. In · November, 1887, Shadler took his traction engine, without separator, and started to cross the bridge. When he had passed over about twenty feet of that structure, it suddenly broke down, threw the steam-engine and boiler into the river, killed Shadler, and injured his assistant.

The evidence tended strongly to show that the joist beams and other important timbers of the bridge were badly decayed, and that the structure generally was in bad repair; that ordinary inspection would have disclosed these defects, and that the duty of keeping the bridge in safe condition for ordinary purposes of travel had been sadly neglected.  It further appeared that the bridge was built by the county of Huntingdon in 1839, and was entered of record as a county bridge ; that in 1846 Blair county was formed from parts of Bedford and Huntingdon, embracing the townships in which the bridge had been erected seven years before ; that, from the organization of Blair county until the date of the accident, the bridge was known as a county bridge, and the only repairs ever made thereon were made by that county ; that in 1871, and again in 1881, somewhat extensive repairs were made, but in the latter year the county commissioners neglected to replace the decayed joist beams and make other repairs necessary to render the bridge safe for ordinary travel.

The questions of fact presented by the evidence were submitted to the jury in a clear and comprehensive charge, to which no exception was taken.  In affirming defendant's points, the learned judge, in effect, instructed the jury that if " Shadler, in attempting to cross the bridge, was using it in an extraordinary manner, or with an extraordinary vehicle of unusual weight, not suitable to a highway opened and prepared to be used in the common intercourse of society and in the transaction of the usual and ordinary affairs of business, he took upon

Opinion of the Court.

himself the risk of injury, and the plaintiffs have no right to recover from the county, even though such injury was the result of such defects and imperfections of the bridge as would render the county liable to individuals lawfully and properly using the same;" that, before crossing the bridge, Shadler was bound to take notice of its apparent strength, the purpose for which it was built, and the kind of vehicles ordinarily used thereon, and if he took upon the bridge a vehicle of extraordinary weight, with such weight concentrated in an unusual manner, so as to be unusually perilous, then he was putting the bridge to an unusual and extraordinary use, and the plaintiffs are not entitled to recover; that, if an "ordinarily prudent man, in transporting a traction engine, such as his was, across the bridge, would have first examined the condition and strength of the bridge, then it was not ordinary prudence and care in Shadler to attempt to cross as he did;" that "the duty of the county commissioners was well performed if the bridge was in a reasonably safe condition for travel, in the ordinary mode used in the neighborhood, by people who commonly used said bridge." In view of these and other well-guarded and proper instructions, the jury must have found that, without any fault of his own, the deceased lost his life in consequence of the negligence of those whose duty it was to keep the bridge in proper condition for public travel. The questions of fact submitted to the jury were thus definitely settled in favor of the plaintiffs.

The main ground of defence, however, was that the county defendant could not in any event be liable, because, under the law applicable to the territory out of which it was formed, it was not the duty of the defendant to repair the bridge. The court was accordingly requested to charge that, the bridge "being in a part of Huntingdon county which was separated therefrom in 1846 to form the county of Blair, and the act of April 13, 1843, imposing on counties the liability to repair county bridges, having been repealed as to Huntingdon county by the act of March 11, 1844, there can be no recovery in this case, and the verdict must be for defendant." The facts of which that legal proposition is predicated being undisputed, the question of law presented therein was reserved by the court, with the right to enter judgment non obstante veredicto. That

VOL. CXXXVI—32

was afterwards done, and the question now is whether the learned judge did not err in so doing.

The act of April 13, 1843, P. L. 221, expressly declares: "It shall be the duty of the county commissioners of the several counties of the commonwealth to repair all bridges erected by the county, and to pay the expense of such repairs out of the county treasury in the usual manner." This is undoubtedly the general law of the state on the subject of repairing county bridges, and was so when the county defendant in 1846 was erected out of parts of Bedford and Huntingdon counties. The first section of the act of February 26, 1846, P. L. 64, after specifying the territory that was thereby erected "into a new and separate county, to be called Blair," declares: "The inhabitants thereof shall, from the fourth Monday of July next, have all such courts, jurisdictions, officers, rights, and privileges as the inhabitants of the other counties of this commonwealth are or may be entitled to; and all officers therein shall be qualified in the same manner and be subject to perform the same duties . . . . . as other similar officers in said other counties." This is followed by a provision for electing, at the next township, borough, and general elections, such officers as, under the general law of the state, the qualified electors of other counties were authorized to elect. "The other counties of this commonwealth," referred to in the act, are evidently those counties that were then and still are subject to the general law relating to township, borough, and county officers, and prescribing their duties. The supplement of April 20, 1846, P. L. 398, to the act creating Blair county, provides that the governor shall, on or before the second Monday of June next, "appoint three judicious persons as commissioners of said county, to serve until their successors shall be duly elected and qualified, who shall perform the usual duties of county commissioners." One of the usual duties of county commissioners then, as now, was to keep county bridges in good repair; and, in so interpreting the law, at that time and for many years thereafter, we think the commissioners of Blair county were right. The mistake that was ultimately made by their successors in office was in neglecting to discharge that duty as they should have done, and in then attempting to evade

Syllabus.

the consequences of their negligence by repudiating the obligation which that long-recognized duty imposed on them.

It is impossible to consider the provisions of the act of 1846, to which reference has been made, without coming to the conclusion that, in erecting the new county of Blair, the legislature intended to subject the territory embraced therein to the general laws of the state, relating not only to the election and qualification of township, borough, and other officers, but also to the duties of such officers, respectively, as prescribed by said general laws. The act, in express terms, declares that "all officers therein shall be qualified in the same manner, and be subject to perform the same duties," as similar officers in the other counties of the state generally. If that be so, it was clearly the duty of the county commissioners, under the general law, to.repair the bridge in question. For more than forty years they recognized that duty, and undertook to perform it. It was not until after Shadler was killed in consequence of their negligence, as the jury found, that they attempted to deny the existence of the obligation they had theretofore recognized and assumed to perform. We think, therefore, that the learned judge erred in entering judgment for defendant non obstante veredicto.

> Judgment reversed; and judgment is now entered on the verdict, in favor of plaintiffs, for $2,000, with interest from January 29, 1890, the date of the verdict.